AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
**3/20/2025**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
3/21/2025
**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ jm _____ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>ANTONIO ESPINOZA ZARATE,<br>    aka "El Gato,"<br>    aka "Antonio Espinoza Sarate,"<br>    aka "Armado Mendez,"<br><br>          Defendant. | Case No.  2:25-MJ-01662-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 11, 2023, August 15, 2023, and February 7, 2025, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with the Intent to Distribute a Controlled Substance |
| 8 U.S.C. § 1326(a), (b)(2) | Illegal Reentry of a Removed Alien |

This criminal complaint is based on these facts:  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Shabnam Aboubakri, Special Agent_
*Complainant's signature*

Shabnam Aboubakri, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    3/21/2025

*Judge's signature*

City and state:   Los Angeles, California

Hon. Michael B. Kaufman, U.S. Magistrate Judge
*Printed name and title*

AUSA:    Diane Roldán (x6567)

## AFFIDAVIT

I, Shabnam Aboubakri, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for Antonio Espinoza Zarate ("ZARATE"), also known as "El Gato," also known as "Antonio Espinoza Sarate," also known as "Armado Mendez," charging him with violating Title 21, United States Code, § 841(a)(1) (Possession with the Intent to Distribute a Controlled Substance) and Title 8, United States Code, § 1326(a), (b)(2) (Illegal Reentry of a Removed Alien).

2. This affidavit is also made in support of search warrants to search the following:

     a. The person of ZARATE, and any digital devices recovered thereon, as described in Attachment A-1;

     b. The person of Francisco Javier Espinoza Galindo ("Galindo"), and any digital devices recovered thereon, as described in Attachment A-2; and

     c. Galindo's 2013 Audi bearing California license plate 6ZAG219 ("SUBJECT VEHICLE"), as described in Attachment A-3.

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 8 U.S.C. § 1326 (Illegal Reentry of a Removed Alien); 18 U.S.C. §§ 922(a)(1)(A) (Unlicensed Dealing in Firearms), 922(g)(1) (Felon in Possession of a Firearm or Ammunition), 922(g)(5)

(Illegal Alien in Possession of a Firearm), 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime); 21 U.S.C. §§ 331(i)(3) (Sale of Counterfeit Drugs), 841(a)(1) (Distribution and Possession with the Intent to Distribute a Controlled Substance), 846 (Conspiracy to Distribute Controlled Substances), and 860 (Distribution of a Controlled Substance in or Near Schools) (the "Subject Offenses"), as described in Attachment B.  Attachments A-1 through A-3 and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since February 2022.  I am currently assigned to the HSI office in Paramount, California, where I work with the El Camino Real Task Force.

6.    Before my current employment with HSI, I served as a Criminal Analyst with HSI from October 2016 until February 2022.

Prior to becoming a Criminal Analyst, I served on Active Duty in the United States Coast Guard as an Intelligence Specialist from August 2010 until October 2016.  I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in May 2022.

7. During my employment with HSI, I have been trained on and participated in investigations that involve drug trafficking.  I have received training involving use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques, and conspiracy investigations.  I have participated in narcotics investigations and have debriefed defendants and witnesses who had personal knowledge of narcotics trafficking organizations.

8.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the concealment methods employed by individuals involved in drug trafficking and how they use digital devices to facilitate and conceal their crimes.  I am also familiar with conducting physical surveillance, executing search warrants, directing confidential informants, and conducting arrests.  Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection and laundering of drug trafficking proceeds.  I am also familiar with methods employed by drug traffickers and large-scale drug trafficking organizations to impede detection by law

enforcement, including the use of coded language, counter-surveillance, multiple vehicles, prepaid or debit calling cards, cellular telephone technology, false or fictitious identities, and encoded communications.

9.   During my employment with HSI, I have also received training and acquired experience in reading DHS "A-Files" and other immigration records.

### III.  SUMMARY OF PROBABLE CAUSE

10.   Since 2023, HSI has been investigating a drug and gun-trafficking conspiracy involving ZARATE and his son, Galindo. ZARATE has multiple felony convictions, is an illegal alien who has been previously removed from the United States on multiple occasions, and is not a federally-licensed firearms dealer.  The SUBJECT VEHICLE is registered to Galindo.

11.   On July 11, 2023, ZARATE sold a pistol, a rifle, 131 rounds of ammunition, and approximately 527.42 grams of fentanyl pills to a confidential informant (the "CI")[1], working at the direction of HSI.  The sale occurred at the registered address for the SUBJECT VEHICLE.  During the meeting, ZARATE had told the CI that Galindo would supply the fentanyl pills, which ZARATE later gave to the CI.

---

[1] The CI does not have legal immigration status in the United States and is cooperating with law enforcement in hopes of receiving immigration benefits.  The CI has previously sustained misdemeanor convictions for driving with suspended license.  The CI has been paid $3,000.00 during the time he has worked as a CI for HSI. The CI's information has been corroborated throughout the investigation and deemed to be credible and reliable.  The CI's information has led to the seizure of drugs, money, and guns in the past.

12.   On August 15, 2023, ZARATE sold an AR-style rifle and approximately 1.06 kilograms of fentanyl pills in a U.S. Post Office ("USPS") envelope to an undercover agent ("UCA").  Law enforcement saw Galindo retrieve the USPS envelope from a parked car, and give it to ZARATE, who then gave it to the UCA.  The sale occurred at the registered address of the SUBJECT VEHICLE.

13.   On January 16, 2025, ZARATE sold a rifle, a pistol, a revolver, and ammunition to the CI.

14.   On February 7, 2025, ZARATE sold approximately 550.63 grams of fentanyl pills to the CI.  At the same meeting, law enforcement saw ZARATE in the SUBJECT VEHICLE with Galindo.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    **ZARATE Is a Felon and Is Not a Licensed Firearm Dealer.**

15.   Based on certified conviction records, ZARATE has the following felony convictions:

a.   On March 17, 2008, ZARATE was sentenced to serve two years in state prison following his March 10, 2008, conviction of a violation of California Health and Safety Code § 11351, Possession of Narcotic Control Substance for Sale, in the Superior Court of California, County of Los Angeles, case number SA066064-01, under the name Antonio Espinoza Sarate.

b.   On April 12, 2012, ZARATE was sentenced to probation following his April 12, 2012, conviction of a violation of California Health and Safety Code § 11350(A), Possession of a Controlled Substance, in the Superior Court of

California, County of Los Angeles, case number SA0675487, under the name Armado Mendez.

c.    On April 26, 2012, ZARATE was sentenced to 30 days in jail following his April 26, 2012, conviction of a violation of California Health and Safety Code § 11350(A), Possession of a Controlled Substance, in the Superior Court of California, County of Los Angeles, case number SA075487, under the name Antonio Zarate, aka Armando Mendez.

d.    On June 2, 2015, ZARATE was sentenced to 36 months in prison following his March 25, 2015, conviction of a violation of 8 U.S.C. § 1326(a), (b)(1), Illegal Reentry of a Removed Alien, in the United States District Court for the District of Arizona, case number 15-CR-00007-001-PHX-SRB, under the name Antonio Espinoza-Zarate.

16.    Based on a search of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Federal Licensing System database, ZARATE is not licensed to engage in the business of dealing in firearms.  I confirmed this through conversations with ATF agents and by examining screenshots showing no results in the Federal Licensing System database for ZARATE's name.

**B.    ZARATE Is an Illegal Alien Who Has Been Previously Removed on Multiple Occasions**

17.    In the 2015 plea agreement for ZARATE's conviction for Illegal Reentry of a Removed Alien, available on PACER under case number 2:15-cr-00007-SRB, docket number 26, ZARATE admitted: "I am not a citizen or national of the United States. I was removed from the United States through San Ysidro,

6

California, on October 29, 2014.  I was voluntarily present and found in the United States at or near Wellton, Arizona, on November 7, 2014.  I did not obtain the express consent of the United States government to reapply for admission to the United States prior to returning to the United States.  For sentencing purposes, I admit I was convicted of Possess/Purchase for Sale a Narcotic or Controlled Substance, a felony, on March 17, 2008, in the Superior Court of California, Los Angeles County.  I was represented by an attorney, and I was sentenced to 2 years in prison."

18.  Based on my training and experience, I know that a DHS "A-File" is a file in which immigration records are maintained for aliens admitted to or found in the United States.  I also know that a DHS A-File usually contains photographs, fingerprints, court records of conviction, and records relating to deportation or other actions by INS or DHS with respect to the subject alien for whom the DHS A-File is maintained.

19.  I have obtained and reviewed the DHS A-File A200710564 (the "DHS A-File"), which is maintained for the subject alien "Antonio Espinoza-Zarate" (ZARATE).  The DHS A-File contained the following documents and information:

a.  Photographs of the subject alien to whom this specific DHS A-File corresponded.  I compared the photographs in the DHS A-File to photographs taken of ZARATE during the course of this investigation.  In addition, the A-File repeatedly refers to a FINS, or fingerprint identification number, of 18054528.  This same fingerprint identification number

corresponds with ZARATE's criminal history records and HSI law enforcement databases.  I thus determined that this DHS A-File and its contents corresponded to ZARATE.

      b.   A Warrant of Removal / Deportation (Form I-205), indicating that ZARATE was officially removed from the United States on or about June 24, 2017.  I know from my training and experience that a Warrant of Removal is executed each time a subject alien is removed and excluded from the United States by ICE (and its predecessor agency, INS) and usually contains the subject's photograph, signature, and fingerprint.  The executed Warrant of Removal/Deportation in defendant's DHS A-File contained his photograph, signature, and fingerprint.

      c.   A Warrant of Removal / Deportation (Form I-205), indicating that ZARATE was officially removed from the United States on or about October 29, 2014.  The executed Warrant of Removal/Deportation in defendant's DHS A-File contained his photograph, signature, and fingerprint.

      d.   A Warrant of Removal / Deportation (Form I-205), indicating that ZARATE was officially removed from the United States on or about February 7, 2013.  The executed Warrant of Removal/Deportation in defendant's DHS A-File contained his photograph, signature, and fingerprint.

      e.   A Warrant of Removal / Deportation (Form I-205), indicating that ZARATE was officially removed from the United States on or about July 14, 2010.  The executed Warrant of Removal/Deportation in defendant's DHS A-File contained his photograph, signature, and fingerprint.

f.    Various documents, in addition to the Warrants of Removal/Deportation, indicating that defendant is a native and citizen of Mexico.  For example, the DHS A-File contains a sworn, Mirandized statement by ZARATE, executed on November 8, 2014, attesting: "I was born on 01/13/1970 in Oaxaca, Oaxaca, Mexico … I have not applied to the Attorney General of the United States or the Secretary of the Department of Homeland Security for permission to re-enter the United States after my removal."

20.  Based on my review of defendant's DHS A-File, I determined that it does not contain any record of his ever applying for, or receiving from the Attorney General or the Secretary of Homeland Security, permission to re-enter the United States.  Based on my training and experience, I know that such documentation is required to re-enter the United States legally after deportation, and that if such documentation existed, it would ordinarily be found in defendant's DHS A-File.

**C.    On June 15, 2023, ZARATE Offered to Sell Drugs to a CI**

21.  In June 2023, a CI informed HSI that a drug trafficker known as "Gato" (later identified as ZARATE) was interested in selling fentanyl.  ZARATE wanted to meet the CI in person to establish the CI's credibility.

22.  On June 15, 2023, HSI conducted an operation for the purpose of arranging the in-person meeting between the CI and ZARATE.  Prior to the meeting, HSI provided the CI with a video and audio-recording devices, which subsequently captured portions of the meeting.

23.   ZARATE arranged to meet the CI in an alley outside of a detached garage labeled "D" located at 3988 S. Centinela Ave, Los Angeles, CA 90066.  This is the registered address of the SUBJECT VEHICLE.  The SUBJECT VEHICLE is registered to Galindo.

24.   During the June 15, 2023, meeting, ZARATE told the CI he could get larger quantities of drugs but did not want to deal in smaller personal use quantities.  ZARATE also told the CI that if the CI wanted anything he would order it on short notice.  ZARATE also said that they could talk in code if the CI wanted to order drugs.  The CI asked if ZARATE could get the pills in colors; in response, ZARATE asked if he could make a call.

25.   Based on toll records, ZARATE proceeded to make a phone call to the phone number (310) 341-5849, which is subscribed to Galindo.  After the call, ZARATE told the CI that his son did not answer and that it had gone to voicemail.  The CI then left the meeting area.  After the CI departed, ZARATE called the CI back and stated that his son (Galindo) had called back.  ZARATE reported that his son only had blue pills and not the colorful ones.

26.   During the June 15, 2023, meeting, the CI obtained two photographs of ZARATE, which law enforcement used to confirm his identity by comparison to prior arrest records.  One of these photographs is included in Attachment A-1.

**D.  On July 11, 2023, ZARATE Sold Two Firearms, Ammunition, and Fentanyl Pills to the CI.**

27.  On July 11, 2023, ZARATE sold the CI fentanyl pills, ammunition, and two firearms at the registered address of the SUBJECT VEHICLE.

1.  <u>ZARATE Sold Firearms, Ammunition, and Fentanyl</u>

28.  In July 2023, in the days leading up to the purchase, the CI communicated with ZARATE in several recorded calls conducted in Spanish.  In the calls, ZARATE agreed to sell a rifle, a pistol, and ammunition to the CI for $1,700.  ZARATE also agreed to sell approximately 5,000 blue fentanyl pills to the CI for $4,500.  They agreed to meet on July 11, 2023, at the same location as their prior meeting (on June 15, 2023), which is the registered address of the SUBJECT VEHICLE.

29.  On July 11, 2023, law enforcement coordinated a controlled purchase of firearms, ammunition, and drugs from ZARATE using the CI.  Prior to the operation, law enforcement met with the CI and affixed hidden video and audio-recording devices to the CI's person, which recorded portions of the interaction.  Law enforcement also searched the CI's person and found that the CI did not have any weapons or drugs.

30.  When the CI arrived at the meet location, ZARATE was sitting in detached garage labeled "D" located at 3988 S. Centinela Ave, Los Angeles, CA 90066.  ZARATE informed the CI that he had the rifle ready, but that he needed to pick up the pistol.  The following are still images of the CI's hidden camera recording showing ZARATE retrieving the rifle.

 

31.  ZARATE also said that his son was going to get the fentanyl pills and would be back in approximately 30 minutes. Law enforcement observed a young Hispanic male matching the description of Galindo leaving 3988 S Centinela Ave Los Angeles, CA 90066; he arrived back at the garage approximately one hour later and walked into the garage labeled D with ZARATE.  Shortly after, Galindo walked out of the garage and went back inside Apartment D.  ZARATE then presented a white bag and long tan bag to the CI.  The CI inspected the contents of the white bag and saw a small pistol and five small bags of blue fentanyl pills inside.  The CI also opened the long tan bag and saw a rifle-style firearm inside.

32.  The CI placed all of the items in the rear of the CI's vehicle.  The CI then paid ZARATE $6,200 in cash for the firearms and drugs and left the area.

33.  Following the controlled purchase, law enforcement met with the CI at a pre-determined location.  The CI gave law

enforcement the pills, ammunition, pistol, and rifle ZARATE had sold to the CI.

34.   HSI determined the ZARATE had sold the CI (1) one bolt action rifle, bearing serial number 18565; (2) one Glock pistol, bearing serial number BPV056 US; (3) 131 rounds of assorted ammunition; and (4) one rifle scope and one cloth rifle bag. HSI sent the firearms and ammunition to an ATF firearms specialist for analysis.

35.   The pills consisted of numerous blue, round tablets, bearing an "M" within a box debossed on one side and a "30" and half-tablet score on the reverse.  They were packaged in five plastic bags.  HSI sent the pills to the United States Customs and Border Protection Laboratories and Scientific Services Directorate ("the CBP laboratory") for analysis.

36.   The image below depicts items seized during the July 11, 2023 controlled buy from ZARATE:



### 2.    Laboratory Tests Confirmed the Pills Contained Fentanyl

37.   On July 27, 2023, the CBP laboratory issued a report analyzing the blue pills from ZARATE.  The CBP laboratory found that the five clear plastic bags contained approximately 837 tablets, 935 tablets, 942 tablets, 938 tablets, and 940 tablets, respectively, for a total of approximately 4,592 pills.  Based on a statistical sampling of pills from each of the five bags, the CBP laboratory found that there is a 95% confidence that at least 80% of the submitted blue round tablets contained fentanyl.  The total net weight of the five clear plastic bags was approximately 527.42 grams.

### 3.    An ATF Examination Confirmed an Interstate or Foreign Nexus for the Firearm and Ammunition

38.   After receiving the firearms and ammunition from HSI, ATF Special Agent Tiffany Lamphere examined them and issued a report.  Agent Lamphere concluded that the pistol was a Glock model 26 9mm caliber pistol, bearing serial number BPV056 US, which was manufactured by Glock in Austria.  In order for the firearm to be recovered in California, it must have moved in foreign commerce.

39.   Agent Lamphere concluded that the rifle was a Palmetto Armory model PA-15 multi-caliber rifle bearing serial number SCD585064, which was manufactured by DC Machine LLC in South Carolina.  In order for the firearm to be recovered in California, it must have moved in interstate commerce.

40.   In addition, Agent Lamphere examined each of the 131 rounds of ammunition from ZARATE's sale and concluded that each

round was manufactured outside of the state of California, and so to have been recovered in California, they must have moved in interstate or foreign commerce.

    4.  <u>The Deal Occurred Nearby Several Schools</u>

41. A review of publicly available maps of the area ZARATE chose for the firearms and narcotics deal to occur, 3988 S Centinela Ave, Los Angeles, CA 90066 (the "Deal Location") revealed:

    a.  The Deal Location is approximately 175 meters southwest of an elementary school located at the intersection of Washington Place and Grand View Boulevard.

    b.  The Deal Location is approximately 172 meters south of a special education school located at the intersection of Centinela Avenue and Mitchell Avenue.

    c.  The Deal Location is approximately 310 meters south of an elementary school located on Grand View Boulevard between Pacific Avenue and Mitchell Avenue.

    **E.  On August 15, 2023, ZARATE Sold an AR-style Rifle, Ammunition, and Fentanyl Pills to an Undercover Agent**

42. On August 15, 2023, ZARATE sold a UCA an AR-style rifle, ammunition, and fentanyl pills at the registered address of the SUBJECT VEHICLE. Galindo supplied the USPS mailing envelope containing the fentanyl pills.

    1.  <u>ZARATE Sold a Rifle, Ammunition, and Fentanyl</u>

43. Following the July 11, 2023, controlled purchase, the CI, at the direction of HSI, contacted ZARATE again in recorded calls to introduce an Undercover Agent ("UCA"). The UCA then

contacted ZARATE via recorded phone calls and WhatsApp messaging on or about August 14, 2023. The UCA confirmed a date to meet ZARATE and purchase fentanyl pills and a rifle.

44. On August 15, 2023, the UCA met ZARATE at the same location as the two previous encounters with ZARATE, the registered address of the SUBJECT VEHICLE. ZARATE showed the UCA a black rifle case with an AR-15 style rifle and two magazines. ZARATE informed the UCA he could get more firearms within a week or two. ZARATE told the UCA that the source of supply with the fentanyl would be there shortly. The UCA then paid ZARATE $2,000 cash for the rifle.

45. Law enforcement was conducting surveillance nearby and saw Galindo on the staircase leading up to the second floor of 3988 S Centinela Ave. A short while later, Galindo walked down the staircase to the intersection of Centinela Avenue and Mitchell Avenue; he appeared to be texting and making phone calls. ZARATE then made a call to the suspected source of supply for the fentanyl pills asking for an update on the sources anticipated arrival time.

46. Shortly thereafter, a Kia SUV parked along the curb near Galindo. Galindo opened the Kia's rear passenger door and retrieved a USPS envelope, which appeared to have something inside. Galindo then walked to the garage where ZARATE and the UCA were standing and Galindo handed the USPS envelope to ZARATE. ZARATE then gave the USPS envelope to the UCA. The UCA confirmed that there were blue pills inside the USPS package. The UCA then gave ZARATE $8,000 cash as payment for the pills.

47.  After the operation, the UCA brought the pills and rifle from ZARATE to HSI agents.  HSI determined that the rifle was a Palmetto State Armory PA-15 5.56 mm caliber AR-type rifle bearing serial number SCD585064.  The rifle case also contained two Magpul P-Mag 5.56 mm 30-round rifle magazines.

48.  The fentanyl pills consisted of numerous blue, round tablets, bearing an "M" within a box debossed on one side and a "30" and half-tablet score on the reverse.  The image below depicts items seized during the August 15, 2023 controlled buy from ZARATE.



2.  <u>Laboratory Tests Confirmed the Pills Contained Fentanyl</u>

49.  On September 14, 2023, the CBP laboratory issued a report analyzing the blue pills from ZARATE.  The CBP laboratory found that the large plastic bag contained approximately 9826 tablets.  Based on a statistical sampling of pills from the bag,

the CBP laboratory found that there is a 95% confidence that at least 70% of the submitted blue round tablets contained fentanyl.  The total net weight of the plastic bag was approximately 1.06 kilograms.

**F.    On January 16, 2025, ZARATE sold a rifle, a pistol, a revolver, and ammunition to a CI.**

50.  On January 16, 2025, ZARATE sold the CI a rifle, a pistol, a revolver, and ammunition at the registered address of the SUBJECT VEHICLE.

1.    ZARATE Sold a CI Firearms and Ammunition

51.  On January 14, 2025, the CI reported to HSI that ZARATE had contacted the CI.  ZARATE offered to sell the CI a rifle and pistol style handgun for $2,300.  On January 15, 2025, ZARATE sent the CI a picture and video of the guns he had for sale via text message.  A screenshot of those text messages is depicted below:

//

//



52.  With assistance from ATF and the Los Angeles Police
Department ("LAPD"), HSI arranged for the CI to set a date with
ZARATE to purchase the firearms.

53.  Prior to the meeting time, law enforcement affixed a
hidden audio recording device on the CI's person, which captured
portions of the interaction.  Law enforcement searched the CI's
person and found that the CI was not armed.  Law enforcement
also established surveillance at the meeting location.

54.   On January 16, 2025, law enforcement saw ZARATE exit an apartment located at 3988 S. Centinela Ave Los Angeles, CA 90066.  The CI then met with ZARATE in the alley outside of the garage.  After greeting the CI, ZARATE went back into the same apartment and exited with a large duffle bag.  ZARATE gave the duffle bag to the CI.  The CI inspected the contents of the bag and saw a rifle, a pistol style handgun, a revolver, and ammunition.  The CI then left the area.

55.  After the operation, the CI provided the handgun, revolver, and ammunition to law enforcement, which then provided them to ATF for examination.  Below is a picture of the firearms and ammunition sold by ZARATE:



    2.   <u>An ATF Examination Confirmed an Interstate or
        Foreign Nexus for the Firearms and Ammunition</u>

56.  After receiving the firearms and ammunition from law enforcement, ATF Special Agent Lamphere examined them and issued a report.  Agent Lamphere concluded that the rifle was a Palmetto Armory model M4A1, 5.56 NATO caliber rifle bearing serial number W036459, which was manufactured by DC Machine LLC in South Carolina.  In order for the firearm to be recovered in California, it must have moved in interstate commerce.

57.  Agent Lamphere concluded that the pistol was a Glock model 27 .40 S&W caliber pistol bearing serial number AGPW920, which was manufactured by Glock in Georgia.  In order for the firearm to be recovered in California, it must have moved in interstate commerce.

58.  Agent Lamphere concluded that the revolver was a Rossi model m68 .38 Special caliber revolver bearing serial number D444158, which was manufactured by Rossi in Brazil.  In order for the firearm to be recovered in California, it must have moved in foreign commerce.

59.  In addition, Agent Lamphere examined each of the 46 rounds of ammunition from ZARATE's sale and concluded that each round was manufactured outside of the state of California, and so to have been recovered in California, they must have moved in interstate or foreign commerce.

**G.  On February 7, 2025, ZARATE Sold Fentanyl Pills to a CI from the SUBJECT VEHICLE, Driven by Galindo.**

60.  On February 7, 2025, ZARATE sold the CI 4,693 counterfeit Oxycodone pills containing fentanyl.  At the meeting

location, law enforcement saw ZARATE and Galindo in the SUBJECT
VEHICLE.

    1.   <u>Zarate Sold Fentanyl Pills to the CI</u>

61.  On February 6, 2025, the CI communicated with ZARATE
via recorded calls and text messages regarding the purchase of
5,000 fentanyl pills.  ZARATE agreed on $1.25 per pill.  On
February 7, 2025, ZARATE told the CI to meet him at a different
location from the previous buys.  This time, ZARATE asked the CI
to meet him in Culver City, CA and to park in front of a
discount clothing store.

62.  Prior to the arranged time for the meeting between
ZARATE and the CI, the CI met privately with law enforcement.
Law enforcement searched the CI and confirmed that the CI did
not have any drugs.  Law enforcement also affixed a hidden audio
and video recording device on the CI's person.

63.  On February 7, 2025, at the pre-arranged time, the CI
arrived at the meet location by car.  The CI's hidden video
camera then recorded ZARATE approaching the CI's car:



64.  ZARATE then handed the CI a red Nike shoe box.  The CI
opened the shoe box and saw five clear plastic bags containing
numerous blue, round tablets, bearing an "M" within a box
debossed on one side and a "30" and half-tablet score on the
reverse.  The CI then gave ZARATE $6,000 in cash.[2]  The CI's
video recording shows the CI receiving the red Nike shoe box,
and giving ZARATE a large stack of $100 bills.

65.  After the transaction, law enforcement briefly lost
visual on ZARATE.  Moments later, law enforcement saw a Hispanic
male (later identified as Galindo) enter the SUBJECT VEHICLE,
which bore a California license plate number 6ZAG219.  Law
enforcement then saw ZARATE exit the driver's seat of the
SUBJECT VEHICLE, speak briefly with another person, and return
to the SUBJECT VEHICLE's driver's seat.  Based on a DMV records
check, the SUBJECT VEHICLE was registered to "Francisco J.
Espinoza" (Galindo), at 3988 S. Centinela Ave, Unit D, Los
Angeles.  Law enforcement identified the Hispanic male who
entered the passenger side of the SUBJECT VEHICLE as Galindo by
comparing his appearance with his California driver's license
photograph.

66.  Law enforcement followed the SUBJECT VEHICLE as it
returned to 3988 S. Centinela Avenue, the SUBJECT VEHICLE's
registered address.  There, law enforcement saw ZARATE place

---

[2] Although the negotiated price for this purchase of
evidence was $1.25 per tablet, the CI only provided ZARATE
$6,000 in cash.  During this operation the CI told ZARATE that
he would pay the $250 balance of the amount owed on a subsequent
purchase.

what appeared to be money or a small object next to Apartment D,
and then return to the SUBJECT VEHICLE and depart.  Law
enforcement then saw the SUBJECT VEHICLE travel to Northgate
Market in Culver City, California.  Once there, the SUBJECT
VEHICLE parked.  Law enforcement saw Galindo now sitting in the
driver's seat, depicted below:



67.  Meanwhile, immediately, after the transaction, the CI
left the area and met with law enforcement at a pre-determined
area.  The CI had the red Nike box, which the CI gave to law
enforcement.  Inside, law enforcement found five bags of blue
pills.  The below image depicts items seized during the February
7, 2025, controlled sale of drugs by ZARATE to the CI:



    2.   <u>Laboratory Tests Confirmed the Pills Contained Fentanyl</u>

68. On March 3, 2025, the CBP laboratory issued a laboratory report regarding its analysis of the blue pills. The CBP laboratory found that the five clear plastic bags contained approximately 943 tablets, 937 tablets, 936 tablets, 947 tablets, and 930 tablets, respectively, for a total of approximately 4,693 pills. Based on a statistical sampling of pills from each of the five bags, the CBP laboratory found that there is a 95% confidence that at least 90% of the submitted blue round tablets contained fentanyl. The total net weight of the five clear plastic bags was approximately 550.63 grams.

    3.   <u>The Fentanyl Pills Are Counterfeit Drugs</u>

69. The following image is a close-up of the blue pills sold by ZARATE, showing an "M" inside a box on one side of the pills, and "30" on the other side:



70.   On February 11, 2025, agents provided photos of the tablets received from ZARATE to representatives of SpecGx LLC, a subsidiary of Mallinckrodt Pharmaceuticals PLC ("Mallinckrodt"). Mallinckrodt is the authorized manufacturer of Oxycodone 30 mg tablets bearing an "M" within a box debossed on one side and a "30" and half-tablet score on the reverse.  These logos are marks registered with the United States Patent and Trademark Office.

71.   On February 12, 2025, agents received a certification from Mallinckrodt indicating that the tablets depicted, which were purported to contain fentanyl, were not manufactured with Mallinckrodt's authorization.  Mallinckrodt also confirmed that fentanyl is not an ingredient in any legitimately manufactured Oxycodone tablet, and thus any tablet bearing the "M" within a

box logo on one side and a "30" on the other but containing
fentanyl is not a legitimate Oxycodone tablet.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

64.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous
co-conspirators, from lower-level dealers to higher-level
suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, in their vehicles,
and in their residences.

c.  Communications between people buying and selling drugs
take place by telephone calls and messages, such as e-mail, text
messages, and social media messaging applications, sent to and
from cell phones and other digital devices.  This includes
sending photos or videos of the drugs between the seller and the
buyer, the negotiation of price, and discussion of whether or

not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises. Drug traffickers may maintain multiple vehicle and switch between vehicles to avoid detection by law enforcement.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

72.    From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who possess or purchase firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices or in their cars.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the

unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

73. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[3]

74. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

2. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ZARATE and/or Galindo's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ZARATE and/or Galindo's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

2.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

75.  For all the reasons described above, there is probable cause to believe that ZARATE committed violations of Title 8, United States Code, Section 1326 (Illegal Reentry by a Removed Alien) and Title 21, United States Code, Section 841(a)(1) (Possession with the Intent to Distribute a Controlled Substance).

76.  In addition, for all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on ZARATE's person, Galindo's person, and in the SUBJECT VEHICLE, as described in Attachments A-1 through A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ___21st___ day of
March 2025.

_____
HONORABLE MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE